UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CRIMINAL ACTION NO. 5:23-cr-00009 -KKC-MAS

UNITED STATES OF AMERICA                                           PLAINTIFF,

v. **DEFENDANT MICHAEL BREGENZER'S REPLY TO THE UNITED STATES' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS**

ALZADON, ET AL                                                     DEFENDANTS.

## I. Introduction

On July 7, 2025, Defendant Michael Bregenzer ("Mr. Bregenzer") filed a motion for a renewed judgment of acquittal under Federal Rule of Criminal Procedure 29(c), or in the alternative, a new trial under Rule 33. (R. 271). That same day, co-defendants Jose Alzadon and Barbie Vanhoose ("Alzadon" and "Vanhoose") filed a similar motion. (R. 272). On August 14, 2025, the government submitted an Omnibus Response opposing all three motions. (R. 298). Mr. Bregenzer now submits this reply.

## II. Argument

### a. The Government Overstates the Sufficiency of the Evidence (Count 1)

The Government asserts that ample evidence supports the convictions. (R. 298, 5286-88). But this assertion curtails Rule 29's controlling standard. Under Rule 29, a conviction must be set aside if no rational trier of fact "could have found the essential elements of the crime beyond a reasonable doubt" when the evidence is viewed in the light most favorable to the prosecution. *United States v. Moore*, No. 23-1065, 2024 U.S. App. LEXIS 4140, at *4-5 (6th Cir. Feb. 22, 2024).

1

The Government's proof on Count 1 rested primarily on circumstantial inferences and the testimony of cooperators with credibility issues. It points to Skaggs's testimony that "anyone who worked at KAC, including Bregenzer, knew" that Alzadon was treating Dr. Ricardo's patients. (R. 298, at 5290-5291). It highlights McCutcheon's claim that when she raised concerns with Mr. Bregenzer, his "body language" suggested he had heard it before. (*Id*. at 5291). It emphasized that Mr. Bregenzer and Berry considered reporting Alzadon to the medical board but ultimately did not, supposedly because "he was the moneymaker" with "all the patients." (*Id*. at 5292). Finally, it relies on Dr. McClain's testimony that she warned Mr. Bregenzer about Alzadon's conduct and, after resigning days later, concluded that because Mr. Bregenzer "didn't fix anything," he must have condoned the fraud. (*Id*. at 5292) (quoting R. 252 at 2641:7-11).

None of this evidence, even if credited, satisfies the elements of Conspiracy to Commit Health Care Fraud under 18 U.S.C. § 1349. At most, it shows that employees voiced concerns about Alzadon's practices and speculated about Mr. Bregenzer's awareness. Speculation, conjecture, and subjective impressions, including "body language" or post-hoc conclusions drawn from Mr. Bregenzer's inaction, do not establish "(1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *United States v. Bailey*, 973 F.3d 548, 564-65 (6th Cir. 2020) (quoting *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)).

While circumstantial evidence can support a conviction, it must nonetheless be ***sufficient to remove reasonable doubt***. In *United States v. Grimes*, 332 F.2d 1014, the Sixth Circuit reversed a conviction where it was "forced to the conclusion that there was not *sufficient competent evidence* to establish the guilt of the accused beyond a reasonable doubt." *United States v. Grimes*, 332 F.2d 1014, 1017 (6th Cir. 1964). The same flaw exists here. The Government's case relied on inferences

2

piled on speculation, bolstered by witnesses with strong incentives to shift blame. The record fails to demonstrate the existence of an agreement to violate the law, much less any knowledge or intent on the part of Mr. Bregenzer to join that alleged conspiracy. Under Rule 29, such a record cannot sustain a conviction beyond a reasonable doubt.

    b.  **The Government Overstates the Sufficiency of the Evidence (Counts 4-11)**

The Government's Omnibus Response does not address the sufficiency of the evidence as to Counts 4-11 with respect to Mr. Bregenzer, which require proof that he acted with specific intent to commit health care fraud. (R. 298, at 5293- 5294).

The trial record affirmatively demonstrated the absence of a criminal agreement between Mr. Bregenzer, Alzadon, and Vanhoose. To the contrary, the testimony established that Mr. Bregenzer and Alzadon had a contentious relationship. Kristy Berry testified that it was "fair to say" the two did not get along well; a dynamic that ultimately culminated in civil litigation between them. (*See* R. 252, Trial Testimony – Day 5, at 2680-81). These facts are irreconcilable with the Government's theory that Mr. Bregenzer was engaged in a knowing and willful, much less cohesive, fraudulent scheme. At most, the evidence shows interpersonal disputes and business disagreements, not the unity of purpose of mutual agreement required to sustain substantive fraud convictions. Like the deficient conspiracy conviction, there was no evidence presented at trial that tended to prove, at the very least, that Mr. Bregenzer contributed to the execution of the crime or intended to aid in the crime's commission. *See, e.g., United States v. Mahmud*, 541 F. App'x 630, 634-35 (6th Cir. 2013). In *Mahmud*, the Sixth Circuit found sufficient circumstantial evidence of health care fraud where at least one witness's testimony "indicated that [the defendant] directed others to alter dates in patient files to maximize the amount that could be billed to Medicare." *Id*. at 635. Here, however, no such evidence was presented; rather, the government's witnesses merely

3

inferred—or rather speculated—that Mr. Bregenzer somehow must have known. Again, mere inferences and speculative assertions cannot be sufficient to sustain Mr. Bregenzer's substantive convictions.

### c. The Government Misstates the Legal Standard Under *Ruan* (Count 14)

The Government argues that Defendants "misunderstand[]" both *Ruan* and conspiracy law because *Ruan* is supposedly inapplicable to 21 U.S.C. § 843(a)(2), which "was the object of the conspiracy to unlawfully distribute controlled substances in this case." (R. 298 at 5312). The Court instructed the jury that Count 14 "charges the Defendants with conspiracy to use in the course of distribution or dispensing of a controlled substance, a registration number which was issued to another person." (R. 224 at 1580; R. 268 at 5039).

But *Ruan* cannot be brushed aside so easily. The Supreme Court's holding was not confined to § 841 alone; it was rooted in a broader principle: when Congress employs the words "knowingly" or "intentionally" in a criminal statute, the Government must prove that the defendant knew the facts that rendered the conduct unlawful. *Xiulu Ruan v. United States*, 597 U.S. 450, 457-58 (2022) ("Consequently, when we interpret criminal statutes, we normally start fro ma longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state") (internal quotation marks omitted)). Section 843(a)(2) contains precisely such language: it criminalizes "knowingly or intentionally" using a registration number that belongs to another.

Thus, the jury was required to find more than the bare fact that prescriptions were submitted under Dr. Ricardo's number. It was required to find that each defendant knew, with respect to each prescription, that the use of the registration number was unauthorized. By instructing that the jury need only find that the number was used in connection with distribution or dispensing, without

4

linking knowledge to each act, the Court relieved the Government of its burden and permitted conviction based on a generalized breach of procedure.

This is exactly what *Ruan* forbids: transforming statutes with a mens rea element into strict liability offenses. Because the instructions omitted the scienter element, the convictions on Count 14 rest on a legally deficient charge to the jury and cannot stand.

Argument from ECF No. 271, at 5098: Gov offered no proof that Bregenzer himself wrote a single prescription, issued dosing instructions, or even saw a patient. It proved only that, during a brief period, an electronic token assigned to Alzadon remained active after staff had requested—though not yet received—a replacement, and that prescriptions generated during that window bore the father's DEA suffix rather than the son's. Accepting the evidence at its strongest, what remains is, at most, a record-keeping violation chargeable under § 843(a)(4) and its companion regulations at 21 C.F.R § 1311. Congress has never equated misfiled electronic signatures with the "knowing or intentional" distribution of controlled substances prohibited by § 841.

The Government's assertion that that jury was "properly instructed" fails on several grounds. When examined in context, the instructions diluted the Government's burden, allowed conviction without individualized findings of intent, and failed to cure prejudice from the evidence presented. (*See* R. 271 at 5098) ("[T]he Government offered no proof that Bregenzer himself wrote a single prescription, issued dosing instructions, or even saw a patient. It proved only that, during a brief period, an electronic token assigned to [Alzadon] remained active after staff had requested—though not yet received—a replacement, and that prescriptions generated during that window bore the father's DEA suffix[…]").

The Government argues that the *Ruan* does not apply to §843. (R. 298, at 5312). This argument misapprehends *Ruan*. The Court in *Ruan* explained that when Congress criminalizes

5

conduct with terms "knowingly" or "intentionally" the Government must prove knowledge of the facts that make the conduct unlawful. Id at 454-455. Section 843(a)(2) contains the same scienter requirement. It is not enough to show that another's registration number was used; the Government was required to prove that each Defendant knew, as to each use and that the prescription was unlawful. By treating each use of another's number as unauthorized, the instruction relieved the Government of this burden as created strict liability for all prescriptions written under Dr. Ricardo's registration number. This is precisely what Ruan forbids.

    **d. Defendants Are Entitled to Relief Relating to Krueger and Elrod's Invocation of Their Fifth Amendment Right Against Self-Incrimination Which Resulted in a One-Way Evidentiary Valve**

The Government downplays the silencing of defense witnesses, claiming it merely identified Fifth Amendment concerns. (R. 298, 5291-93). Both Krueger and Elrod had received subpoenas to testify at trial and had no charges pending. Trial took place two years after the Indictment was filed. The Government had knowledge of the involvement of both Krueger and Elrod and could have indicted them at any time. Yet, as the witnesses were about to testify for the defense, the Government abruptly had Fifth Amendment concerns that in fact could have been raised when it received the subpoenas or at the pretrial conference. The sudden appointment of counsel led to blanket invocations, even to innocuous questions such as whether they were ever employed by KAC. (Tr., R. 264, at 155-58, 167; Tr., R. 266 17-18.).

The trial court failed to conduct the required question-by-question inquiry to determine the validity of Krueger and Elrod's Fifth Amendment invocations, as mandated by *Hoffman v. United States*, 341 U.S. 479. This blanket acceptance of their invocations deprived the defense of its Sixth Amendment right to present a complete defense. The Sixth Circuit has held that such conduct constitutes reversible error when it substantially interferes with a defendant's ability to present

exculpatory evidence. The Sixth Circuit has defined "substantial interference" with a defendant's right to present exculpatory evidence as government conduct that significantly impairs a witness's "free and unhampered determination to testify." This principle is rooted in the fundamental due process right of a defendant to present witnesses in their defense, as recognized in *Washington v. Texas*, 388 U.S. 14 (1967), *United States v. Foster*, 128 F.3d 949 (6th Cir. 1997), *United States v. Stuart*, 507 F.3d 391 (6th Cir. 2007), *Johnson v. Bell*, 525 F.3d 466 (6th Cir. 2008). Here, the Government essentially drove these witnesses off the stand through prosecutorial suggestion that they could be indicted as both Krueger and Elrod were unindicted co-conspirators with time left of the statute of limitations. Despite the Government's position, there is a fine line between identifying potential a Fifth Amendment issue and witness intimidation. In Mr. Bregenzer's case, the Government crosses this line, depriving him of due process.

e.  **Selective Use of Immunity Distorted the Fact-Finding Process**

The Government asserts that it had no duty to immunize Krueger. (R. 298 at 5307-10). That position oversimplifies the governing law and understates the prejudice caused by Krueger's absence. The Government cites *United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999) arguing that the Court lacks the authority to compel immunity. The Sixth Circuit recognizes two circumstances when compelled immunity is appropriate, under the prosecutorial misconduct exception and the effective defense exception. *United States v. Meda*, 812 F.3d 502, 518 (6th Cir. 2015). The Government's argument that neither situation apply here ignores the record.

The Government emphasizes that no witness was granted immunity. (R. 298, 5308). That framing is misleading. While the Government did not grant statutory immunity under 18 U.S.C. § 6002, it strategically used cooperation agreements, plea deals, and proffer protections to secure testimony against Bregenzer. Here, Berry, an admitted participant in the scheme, provided

extensive testimony after pleading guilty. Similarly, Krueger gave two proffer interviews pursuant to an agreement that protected him from direct use of his statements. The result was an egregious lopsided presentation. The jurors heard from Berry, McClain, and others under the Government's assurance, but were denied the opportunity to hear from Krueger's point of view, that would have supported the defense's theory. This is the precise imbalance the *Meda* exception was designed to address.

By raising the concern about Fifth Amendment protections, the Government insulated itself from having to confront Krueger's potentially exculpatory testimony, while retaining the benefits of his recorded statements when they suited its case. This is the definition of distortion of the fact-finding process. The Government's reliance on *Talley* is incomplete. Here, the Government selectively structured immunity-like protection for its own witnesses and discouraged testimony from a defense witness, triggering the Sixth Circuit's limited exceptions. At minimum, due process required that the Court level the playing field either by requiring Kruger's testimony under immunity or excluding the Government's use of protected testimony. The failure to do so deprived Bregenzer of a fair trial.

### f. The Government's Expansive Conspiracy Theory Distorted the Enright Inquiry

The Government defends the admission of co-conspirator statements by asserting that the Court "did as it said it would, making *Enright* findings on the record at the conclusion of the Government's case, including as to statements by Krueger and Elrod," and further argues that Defendants "[n]either at trial nor in their motions" challenged specific exhibits as failing the *Enright* standard. (R. 298 at 5311). That characterization is incomplete.

Defense counsel expressly and unequivocally placed concerns on the record regarding the wholesale admission of emails and statements without the required analysis of whether they were made "in furtherance" of the alleged conspiracy:

> I am concerned that a lot of the statements that the government has admitted, without being able to talk about every one of them right now, many of those were not analyzed to determine whether or not they were in furtherance of the actual conspiracy. That's very concerning. We've seen a lot of emails submitted by the government under the theory that it's an admission of a party opponent or that it is a statement of a co-conspirator, but we haven't analyzed that second part. And the reason why I bring that up, Your Honor, is because I'm still having a lot of trouble understanding what the government's theory of conspiracy is in each aspect. And if they are given carte blanche to develop all sorts of different theories, including the brand-new fresh-off-the-line Pinkerton theory we just heard about today, then it seems like the government may be able to blend the conspiracy to suit the introduction of this testimony, which is very concerning.

(R. 263 at 4384-85).

This objection went to the heart of the Rule 801(d)(2)(e) standard. The Government repeatedly invoked multiple, shifting conspiracy theories to justify the admission of broad categories of hearsay. Yet the Court never conducted a statement-by-statement analysis, nor did it require the Government to tether each proffered exhibit to a clearly defined conspiracy. Instead, it accepted the Government's theory in gross, effectively granting it carte balance to introduce otherwise inadmissible hearsay.

That approach contravenes Sixth Circuit precedent requiring careful scrutiny of whether each statement was made "during the course" of the conspiracy. *United States v. Enright*, 579 F.2d 980, 982-83 (6th Cir. 1978). By collapsing the individualized inquiry into a blanket ruling, the Court admitted statements that did not further any charged conspiracy, while simultaneously excluding defense exhibits that would have provided exculpatory context. The result was an asymmetric evidentiary record that bolstered the Government's theory while depriving Mr. Bregenzer of the ability to present a fair defense.

9

The improper admission and exclusion of co-conspirator statements was not harmless. It went directly to the core of the conspiratorial and substantive allegations, supplying the Government with the narrative glue it needed to link Mr. Bregenzer to others while silencing countervailing defense evidence. This asymmetry deprived Mr. Bregenzer of due process and warrants reversal or, at minimum, a new trial.

        Respectfully submitted,

        s/ *Ronald W. Chapman II*
        Ronald W. Chapman II, Esq., LL.M.
        MI Bar No. P73179
        (Admitted Pro Hac Vice)
        1441 West Long Lake Road, Suite 310
        Troy, Michigan 48098
        T: (248) 644-6326
        RWChapman@ChapmanLawGroup.com
        *Counsel for Defendant Bregenzer*

## CERTIFICATE OF SERVICE

      I hereby certify that on September 12, 2025, I electronically filed the forgoing document with the clerk of court by using the CM/ECF system which will send the notice of electronic filing to all attorneys of record.

                                            /s/ *Ronald W. Chapman II*
                                            Ronald W. Chapman II, Esq., LL.M.