**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CRIMINAL ACTION NO. 5:23-cr-9-KKC-MAS**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**v.**       **<u>SENTENCING MEMORANDUM FOR MICHAEL BREGENZER</u>**

**MICHAEL BREGENZER**                                          **DEFENDANT**

The United States hereby submits the following Sentencing Memorandum in advance of Defendant Michael Bregenzer's sentencing, scheduled for April 24, 2026.

As set forth below, the Government respectfully submits that: (1) pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Bregenzer's total offense level is 30; and (2) Bregenzer should receive a sentence within the Guidelines range.

**I.       <u>RELEVANT FACTUAL AND PROCEDURAL BACKGROUND</u>**

**A. <u>Indictments and Jury Verdict</u>**

On February 2, 2023, a grand jury in the Eastern District of Kentucky returned an Indictment against Bregenzer and his three co-defendants: José Alzadon, Kristy Berry, and Barbie Vanhoose. The Indictment charged all four defendants with: (a) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); (b) 11 counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–12); and (c) one count of conspiracy to unlawfully distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count 13). *See* R. 1.

On December 12, 2023, Berry pled guilty to Counts 1 and 13 of the Indictment. R. 64. Berry testified at trial against her three co-defendants and was sentenced to six months of imprisonment to be followed by six months of home confinement on August 27, 2025. *See* R. 305.

1

On June 6, 2024, a grand jury returned a Superseding Indictment against Bregenzer, Alzadon, and Vanhoose, charging them with: (a) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); (b) 10 counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–11); (c) two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 12–13); and (d) one count of conspiracy to unlawfully distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count 14). *See* R. 87. Before trial, the Government dismissed two health care fraud counts: Counts 2 and 3. *See* R. 185.

On March 20, 2025, following a three-week jury trial, Bregenzer, Alzadon, and Vanhoose were convicted of conspiracy to commit health care fraud (Count 1); all eight remaining counts of health care fraud (Counts 4–11); and conspiracy to unlawfully distribute a controlled substance (Count 14). Alzadon and Vanhoose were also convicted of two counts of aggravated identity theft (Counts 12–13). *See* R. 226.

### B. <u>Underlying Conduct</u>

As the Court recalls, this case related to Kentucky Addiction Centers ("KAC"), a series of addiction treatment clinics in Kentucky that treated opioid addiction in part by prescribing controlled substances such as Suboxone. Bregenzer was KAC's CEO and held the largest ownership interest in KAC, Berry was also a part owner of KAC, Alzadon was KAC's medical director and a doctor at the practice, and Vanhoose was KAC's billing manager.

Defendants were convicted of defrauding health care benefit programs by billing or causing others to bill: (1) for services, specifically smoking cessation counseling sessions, that were not provided; (2) for office visits at a higher level than the visit that actually occurred (*i.e.*, "upcoding"); and (3) as though the services had been provided by Dr. Ricardo Alzadon ("Dr.

Ricardo"), when in fact the services—if they had been provided at all—were rendered by Alzadon. *See* R. 87, Superseding Indictment, at ¶¶ 31–35, and 39.

In addition to the health care fraud scheme, KAC's front-desk staff maintained possession of electronic prescribing tokens that were issued to Alzadon and Dr. Ricardo. The staff used the tokens to call in prescriptions for Suboxone, a controlled substance, in the name of Alzadon and Dr. Ricardo. Such tokens can only be legally possessed and used by the Drug Enforcement Administration ("DEA")-registered medical provider to whom the token belongs. In addition, although KAC front-desk staff sent in prescriptions under Dr. Ricardo's name at Defendants' direction, it was common knowledge at KAC that Dr. Ricardo had often neither seen the patient nor prescribed the controlled substance.

### C. **Bregenzer's Role**

The evidence at trial showed that Bregenzer was central to the scheme. Dr. McClain described Bregenzer as her "main contact" and "the voice" of KAC. R. 244 at 1957:3-5. As CEO, Bregenzer was deeply involved in and knowledgeable about KAC, particularly its billing. He participated in weekly billing calls, and "knew to the penny how much money that they could make per month on a Medicaid patient." R. 264 at 4470:7-12; R. 260 at 3939:6-7; *see also* GX 459 (text chain in which Ben Ferguson lays out a billing pattern per patient per month, to which Bregenzer replies, "Love it").

Bregenzer owned 40% of KAC, the largest share of any of the owners, and exerted control over the business and its employees. Berry Testimony, R. 252 at 2539 (40% ownership). He directed KAC employees to conduct unnecessarily lengthy counseling sessions or see patients more frequently than necessary to maximize profits. *See* Wright Testimony, R. 255 at 3020:2-22 (when Wright told Bregenzer that many of her stable patients did not need to come to KAC so

frequently, he told her to not move the patients out "all at once" because "it would break the bank"); *see also* Hollon Testimony, R. 263 at 4315-18 (describing pressure to conduct hour-long counseling sessions at Elrod's direction); GX 200 (email from Bregenzer to Elrod directing that all counselors should be doing hour-long sessions). Bregenzer also set up performance metrics to determine whether Vanhoose would receive bonuses and had the authority to determine whether Vanhoose received those bonuses. Berry Testimony, R. 252 at 2541:2-23.

KAC employees also understood that the buck stopped, so to speak, with Bregenzer. Multiple former KAC employees testified that they brought their concerns regarding KAC's practices—including billing for services that were not provided, billing under Dr. Ricardo's name for services Dr. Ricardo did not provide, and the token use—to Bregenzer: Janet Skaggs, Alexis McCutcheon, Dr. Cheryl McClain, and Wendy Fletcher all sounded the alarm. R. 255 at 2816-17 (Skaggs); R. 244 at 1824-26 (McCutcheon); R. 245 at 2058–88 (McClain); and R. 260 at 3976-78 (Fletcher). Fletcher explained that, after the phone call in which she and Dr. McClain raised their concerns, she was left with the impression that KAC "knew the rules, they just weren't following them." R. 260 at 3978. During that same call, Bregenzer texted Berry "This is bad." GX 453.

While Bregenzer recognized the seriousness of the fraudulent conduct McClain and Fletcher raised, nothing changed because Bregenzer wanted to make KAC as profitable as possible to sell KAC for as much money as possible. R. 252 at 2621:2-3 (Berry: "the idea was to make the clinic profitable because that made it more easily marketed to different companies to buy"); 2605:4-6 (Berry: "Mike said that we could not self-report because if we did and we had to pay back all that money, it would break the company. And by breaking the company, that mean that there was no sale, so it would be worth nothing.").

4

And Bregenzer acknowledged that he and Berry were ultimately in control. As he texted Berry in December 2022, "It's going to be problematic for us that we knew there was an issue and didn't address it. And it continued. That's what will get us. Hard to just blame Barbie." GX 475. And Berry explained that "it" was "everything that we were doing wrong, the upcoding, the lack of documentation, the copied-and-pasted notes, the sending meds using doctors' tokens. It covered everything." R. 252 at 2642:24 – 2643:2.

## II.    GUIDELINES CALCULATION AND PRE-SENTENCE REPORT

### A.  The Probation Office's Report and Recommendations

The Probation Office issued a Draft Presentence Investigation Report ("PSR") for Bregenzer on January 9, 2026, and issued the final PSR on April 10, 2026. The revised PSR reflects the following Guidelines calculations:

| Sentencing Item | U.S.S.G. Provision | Offense Level |
|---|---|---|
| Base Offense Level Health Care Fraud | § 2B1.1(a)(2) | 6 |
| Enhancement for Loss | § 2B1.1(b)(1)(J) | +18 |
| Federal Health Care Fraud Offense (>$1m) | §§ 2B1.1(b)(7)(A), (B)(i) | +2 |
| Organizer or Leader | § 3B1.1(a) | +4 |
| **Total Offense Level** | | **30** |

The Government agrees with the Probation Office's Guidelines calculation. Bregenzer objects to (1) the loss calculation, including the two-level enhancement for a federal health care offense with a loss amount exceeding $1 million, and (2) the application of an aggravating role enhancement to his Guidelines.

5

## B. Loss Amount

### 1. The Proposed Conservative Calculation

Consistent with the PSR, the Government submits that the appropriate loss amount for Bregenzer (and for Alzadon and Vanhoose) is **$4,883,397.03**, which results in an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J). This figure consists of:[1]

1)     $722,475.00: the total billed amount to Medicare and Medicaid for all smoking cessation counseling by Alzadon and Dr. Ricardo;

2)     $2,423,486.84: the total billed amount to Medicare and Medicaid for all office visits billed under code 99214 by Alzadon and Dr. Ricardo; and

3)     $1,737,435.19: the total billed amount to Medicare and Medicaid for all office visits billed under code 99213 by Dr. Ricardo.

The loss amount is established by a preponderance of the evidence. *See United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). "When, like here, the losses stemming from financial frauds are difficult to quantify, the district court need only make a reasonable estimate of the loss, given the available information. Such estimates need not be determined with precision. But the district court must actually find facts, and it must do so by a preponderance of the evidence." *United States v. Siefert*, 161 F.4th 379, 400 (6th Cir. 2025) (citations and internal marks omitted); *see also United States v. Ellis*, 938 F.3d 757, 760 (6th Cir. 2019) ("Because of the difficulties often associated with attempting to calculate loss in a fraud case, the district court need only make a reasonable estimate of the loss using a preponderance of the evidence standard.") (internal citations and quotations omitted).

---

[1] These figures are derived from: (a) GX 77a, a summary of claims data derived from GX 620 and GX 621; and (b) Exhibit A to the Affidavit of Tara N. Wilson, R. 350-1 and 350-2.

6

Furthermore, as the Sixth Circuit has recently reaffirmed, "when fraud is 'pervasive,' the entire billed amount counts toward the intended loss, and the burden then shifts to the defense to prove the specific amount by which that amount should be reduced." *United States v. Betro*, 115 F.4th 429, 454–55 (6th Cir. 2024). A finding of pervasive fraud is appropriate if the trial evidence established that the defendants' enterprise employed a scheme, such as one with a "predetermined" protocol to "to maximize profits above all else," and therefore "separating legitimate benefits from fraudulent ones [is] not reasonably practicable." *Id*.

The Guidelines define loss as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b) n.(A). In health care fraud cases, "the aggregate dollar amount of fraudulent bills submitted to the government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1 cmt. n.3(E)(viii); *United States v. Campbell*, 135 F.4th 376, 396–97 (6th Cir. 2025) (affirming the use of intended loss for purposes of sentencing in health care fraud cases).

Here, the Government respectfully submits a conservative calculation of the loss amount that resolves multiple areas of potential ambiguity in Defendants' favor. *Cf. Siefert*, 161 F.4th at 401 (affirming loss amount that accorded a more "generous" credit to a defendant that was extrapolated from trial evidence).

***First***, a finding of pervasive fraud is appropriate here. Defendants routinely billed in the name of a doctor who did not see the patients, billed for services that were not rendered, and kept such poor copied-and-pasted medical records that it is difficult to determine whether—or to what extent—any billing was legitimate. Defendants engaged in fixed billing—without individualizing billing to a particular patient—to maximize profits, and likewise based billing on patients' health

7

care coverage, including billing Medicare for more expensive services, to maximize profits. Therefore, because of Defendants' actions, it is difficult to separate legitimate benefits (for example, any office visit performed by Alzadon in which he actually provided services of the billed level of complexity) from fraudulent ones. Given the appropriateness of the pervasive-fraud finding, the default position on loss should be that Defendants are liable for the full loss amount for all billing associated with Dr. Ricardo and all office visit billing under Alzadon, and much of the billing improperly billed under other providers' NPI numbers, such as the smoking cessation counseling sessions billed under Dr. McClain's and Tiffany Wright's names that they testified that they did not provide. The burden is on Defendants to rebut this default position.

*Second*, despite the appropriateness of applying this higher loss amount based on the pervasive fraud, the Government adopts a more conservative approach. It calculates the loss amount using only three CPT codes—smoking cessation counseling (99406), level three office visits (99213), and level four office visits (99214). In reaching its loss amount, the Government excludes any loss caused by KAC's practice, as proven at trial and per Bregenzer's directives, of unnecessary or unnecessarily lengthy counseling sessions, of smoking cessation counseling billed in the name of other providers that was not rendered, and all of the ancillary services for which KAC billed each time a patient visited KAC, such as breathalyzer tests. Again, testimony at trial and the finding of pervasive fraud supports including all services billed under Dr. Ricardo's name and NPI in the loss amount, but because the gravamen of the Government's case focused on these three codes (*i.e.*, 99406, 99213, and 99214), the Government has limited its loss calculation to those three billing codes and to Alzadon and Dr. Ricardo.

*Third*, the Government has only included loss between October 2017 and December 2020, which is the date range for the health care fraud conspiracy. The Government is nonetheless aware

that Defendants billed Medicare and Medicaid for smoking cessation and for office visits coded as 99213 and 99214 after December 2020, including both billing under Alzadon's name and some billing under Dr. Ricardo's name in early 2021, and such billing could be included in the loss calculation as relevant conduct, but the Government has not done so for now. U.S.S.G. § 1B1.3.

*Fourth*, the Government excluded from its loss calculation level three office visits (99213) billed under Alzadon's name. The evidence at trial showed that medical services billed by KAC under Dr. Ricardo's name were actually performed by Alzadon, to the extent they were performed at all. The evidence further showed that patients did not receive smoking cessation counseling, or the more complex level four office visits denoted by a 99214 billing code. However, the Government recognizes some testimony at trial could support the conclusion that some of the office visits conducted by Alzadon might have been properly billed as level three (99213) visits, although none of the documentation reviewed during trial supported such billing. Therefore, the Government has been conservative in its loss calculation by excluding the amount that KAC billed for level three office visits performed by Alzadon, and only including level three office visits billed under Dr. Ricardo's name.

### 2. None of Bregenzer's Bases for Objection Withstand Scrutiny

Bregenzer objects to the PSR's loss calculation, but none of his proffered reasons withstand scrutiny. As explained above, the Guidelines define loss as the greater of actual or intended loss. In health care fraud cases, the Guidelines specify that the total amount of fraudulent bills submitted to the government health care program is prima facie evidence of the amount of intended loss. U.S.S.G. § 2B1.1(b) n.(A) and cmt. n.3(E)(viii); *Campbell*, 135 F.4th at 396-97. Therefore, the

9

government and the PSR used the fraudulently billed amounts to calculate a reasonable estimate

of the loss in this case. Each of Bregenzer's objections in his letter to Probation are without merit:

- Bregenzer first asserts that smoking cessation was capped at eight times per year, apparently implying that no more than eight incidents of false smoking cessation billing per patient, per year, should be included in the loss amount. This argument is foreclosed by the Guidelines and Sixth Circuit precedent. The Guidelines define intended loss as "the pecuniary harm that the defendant purposely sought to inflict" and specifically include "pecuniary harm that would have been impossible or unlikely to occur," citing as an example insurance fraud in which the claim exceeded the insured value. U.S.S.G. § 2B1.1(b) n.(C)(ii). And the Sixth Circuit has held that, in a health care fraud case, "factual impossibility does not negate an intended loss calculation." *United States v. Betro*, 115 F.4th 429, 456 (6th Cir. 2024).

- Bregenzer next claims, with no support whatsoever, that the third category of billing in the loss calculation—*i.e.*, the total of $1,737,435.19 billed under Dr. Ricardo's name for 99213-coded office visits—is off by $800,000. The government calculated this number by adding the total billed amounts for 99213 office visits during the time period of the conspiracy in GX 620 (Medicare data) and GX 621 (Medicaid data). A more detailed breakdown by year was submitted with the affidavit of Tara Wilson, R. 350-2, and is replicated below:

| Year | Medicare (620) | Medicaid (621) |
|------|----------------|----------------|
| 2017 | $1,714.50 | $11,171.07 |
| 2018 | $74,720.65 | $652,425.29 |
| 2019 | $26,602.68 | $586,255.85 |
| 2020 | $682.12 | $383,863.03 |
| Total | **$103,719.95** | **$1,633,715.24** |
| **Combined Medicare/Medicaid** | **$1,737,435.19** | |

- Bregenzer next claims that the loss amounts are incorrect because they do not include Medicaid Managed Care Organization ("MCO") losses. That is simply incorrect. Government Exhibit 621 identifies the MCO billed by KAC in column AI "Submitting Provider Name of Claim," and the billed amount appears in column AN "Billed Amount." As the Court will remember from trial, when an MCO pays for a service, that amount appears in column AS "Encounter Amount." GX 621; R. 258 at 3527:4 – 3529:3 (McVey testimony explaining "paid" and "encounter" amounts). The losses to each Kentucky Medicaid MCO during the relevant time are also broken out in an exhibit submitted with the affidavit of Tara Wilson, R. 350-3.

10

- To the extent Bregenzer suggests that the loss amount should be reduced by any amounts "later recouped," the government is unaware of any government program recouping any funds from KAC, or of KAC voluntarily paying back funds received for any of the fraudulent billing. Nor has Bregenzer asserted that any such payments took place—he simply makes a generic, unsupported statement that such payments should have been deducted from the loss amount if they had been made. Indeed, Dr. McClain testified that she suggested to Bregenzer and other KAC owners that bringing KAC into compliance could require paying back money to government programs. R. 245 at 2078:3-12 (McClain testimony re: KAC payback). Berry testified that KAC did not self-report, explaining that "Mike said that we could not self-report, because if we did and we had to pay back all that money, it would break the company." R. 252 at 2605:3-8.

- Bregenzer's objection to the two-level enhancement for loss to a government health care program is based on his objections to the loss calculation, and fails for the same reasons.

The government's loss calculation, consistent with the calculation contained in the PSR, should be adopted because it is based on a conservative calculation of the fraudulent amounts billed by KAC and is supported by the claims data contained in GX 620 and 621, as well as the Declaration of Tara Wilson and its accompanying exhibits, R. 350-1, 2 and 3. Alternatively, the government respectfully suggests that this Court could find that, based on the pervasive fraud at KAC, it would be appropriate to hold Bregenzer responsible for the full amount billed under Alzadon's and Dr. Ricardo's names during the course of the conspiracy ($23,073811.71), less any amount for which Bregenzer can offer evidence supporting its exclusion. GX 77b.

With respect to Bregenzer's objection that the PSR does not determine the scope of jointly undertaken criminal activity with respect to Bregenzer in particular, the government respectfully submits that, as discussed further below, Bregenzer was the organizer/leader of the health care fraud conspiracy for which he was convicted in Count One of the Superseding Indictment. Trial testimony established Bregenzer's familiarity with KAC's billing practices and his goal of maximizing KAC's billing ahead of the anticipated sale to BHG. *See* R. 252 at 2621:2-3; 2605:4-6. Moreover, Dr. McClain explained to Bregenzer that KAC should repay government programs

11

for services that were not rendered, and after being informed of this Bregenzer and KAC did not repay any funds. R. 245 at 2078-88; R. 252 at 2605:4-6. Therefore, it is appropriate to hold Bregenzer accountable for the full loss amount of the conspiracy based on the specific facts in this case, as he was the leader of the conspiracy, the pervasive fraudulent billings were in furtherance of the conspiracy, and Bregenzer's individual knowledge of the fraudulent billing practices and refusal to attempt to rectify them was established by McClain's testimony.

### C. Organizer/Leader Enhancement

The Government respectfully submits that, consistent with the PSR, Bregenzer's Guidelines should be increased by four levels due to his role as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a). A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. U.S.S.G. § 3B1.1 cmt. n.1. In considering whether a fraud is "otherwise extensive," courts consider "all persons involved during the course of the entire offense." U.S.S.G. § 3B1.1 cmt. n.3. In addition, in distinguishing a leadership and organization role from others, courts consider "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4.

Bregenzer's role as the leader of KAC is uncontested; his objection merely focuses on the number of participants in the scheme. The evidence at trial proved that the scheme involved more than five participants: First, Bregenzer was one of four co-defendants, all of whom either pled guilty or were convicted at trial. Additionally, the Court also found at trial, pursuant to *United*

*States v. Enright*, 579 F.2d 980 (6th Cir. 1978), that Trouper Krueger and Kristi Elrod were also members of the conspiracy. R. 263 at 4386:8-20; *see also* R. 263 at 4353:9-13 (the Court also viewed Chuck Moran as a co-conspirator in evaluating the admissibility of certain exhibits, although he was not explicitly named as part of the *Enright* finding). The scheme therefore involved more than five participants.

To the extent Bregenzer argues that the unindicted co-conspirators should not be considered "knowing participants," he nonetheless qualifies for an aggravating role enhancement. Specifically, in determining when a scheme is "otherwise extensive," the Sixth Circuit applies a test of numerosity to examine "the contributions of knowing participants and non-participants to determine whether the combination is the functional equivalent of an activity involving five criminally responsible participants." *United States v. Anthony*, 280 F.3d 694, 700 (6th Cir. 2002). The court first considers "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme" and then considers "whether the combination of knowing participants and countable non-participants is the functional equivalent of an activity carried out by five criminally responsible participants." *Id*. at 701.

Here, the fraudulent scheme was undoubtedly extensive; in addition to the four convicted defendants and three unindicted co-conspirators, Bregenzer directed other KAC employees to conduct unnecessarily lengthy counseling sessions or see patients more frequently than necessary to maximize profits. *See* Wright Testimony, R. 255 at 3020:2-22 (when Wright told Bregenzer that many of her stable patients did not need to come to KAC so frequently, he told her to not move the patients out "all at once" because "it would break the bank"); *see also* Hollon Testimony, R.

13

263 at 4315-18 (describing pressure to conduct hour-long counseling sessions at Elrod's direction); GX 200 (email from Bregenzer to Elrod directing that all counselors should be doing hour-long sessions). He directed the functional activity of five or more people, whether evaluated under the rubric of identifying five participants or otherwise extensive activity.

As Bregenzer recognizes, if an enhancement for his leadership role is applied, he cannot be considered for a zero-point offender adjustment under U.S.S.G. § 4C1.1.

### D. Additional Objections

Bregenzer also makes the following objections to the PSR, which are either misplaced, irrelevant to his offense level, or both.

### 1. Grouping

First, Bregenzer objects to the Probation Office's grouping of his conviction for conspiracy to unlawfully distribute controlled substances (Count 14), with his convictions relating to health care fraud (Counts 1, 4-11) as "incorrectly justified" based on the "same victim" and then selectively quotes the PSR. Bregenzer acknowledges that "corrected grouping" will not change the offense level, but does not provide an alternative methodology for grouping.

Section 3D1.2(b) explains that "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" the counts should group. The PSR cited this language. PSR at ¶ 45. The commentary to the Guidelines further explains that where societal interests are the victim "the counts are grouped together when the societal interests that are harmed are closely related," and that "[a]mbiguities should be resolved . . . to identify and group 'counts involving substantially the same harm.'" U.S.S.G. § 3D1.2 cmt. 2.

Based on the facts of this specific case—a complex years-long fraud scheme that also involved the unlawful use of a physician's DEA registration number and prescribing token—and the fact that all of the counts of conviction were part of a course of conduct that was part of a common scheme or plan, it is appropriate to group the fraud counts with the controlled substance count. While Bregenzer is correct that Count 14 has a different victim than the fraud counts, the PSR cited the whole of Section 3D1.2(b) in justifying the grouping, and based on the facts of this case and the commentary to the Guidelines that "counts are grouped together when the societal interests that are harmed are closely related," the government does not see an error in citing this provision as a basis for grouping.

If, alternatively, to determine the combined offense level the Court calculated the offense level for Count 14 separately under § 2D3.1 and then determined the combined offense level pursuant to § 3D1.4, the result would be the same. As noted in the PSR, Count 14 is referenced to § 2D3.1 and an offense level 6. Because Group One, the fraud offenses, has a total offense level of 30, which is more than 9 levels higher than the offense level for Group Two, in determining the total offense level Group Two would be disregarded and the combined offense level would be 30. U.S.S.G. § 3D1.4(c).

### 2. **Objection to Paragraph 88**

Second, Bregenzer objects to the Probation Office's determination in Paragraph 88 of the PSR that, with respect to Count 14, "[t]he statutory maximum sentence is 48 months; therefore, the guideline imprisonment range is 48 months."

Bregenzer's recommended Guidelines range is 97 to 121 months' imprisonment. The statutory maximum for each of the health care fraud counts, Counts One and Four through Eleven, is ten years or 120 months. The statutory maximum for Count 14 is 48 months' imprisonment.

15

Section 5G1.2(c) states that if the sentence to be imposed on the count carrying the highest statutory maximum "is adequate to achieve the total punishment" then sentences on all counts shall run concurrently. The government's understanding of paragraph 88 is that it was intended to alert the Court that, in the event the Court determines that the total punishment for Bregenzer should be within the Guidelines range of 97 to 121 months (or any term of imprisonment greater than 48 months), the Court will need to ensure that any concurrent term of imprisonment to which Bregenzer may be sentenced on Count 14 is capped at 48 months.

### 3. Objection to Paragraphs 100-101

Finally, Bregenzer objects to the imposition of community restitution for Count 14, as set forth in Paragraph 101 of the PSR. The Government respectfully submits that it has not moved for community restitution here.

### III. ANALYSIS OF 3553(a) FACTORS

The federal statute governing sentencing requires district courts to take the applicable Guidelines range into consideration when imposing a sentence, along with other sentencing factors enumerated by Congress. *See* 18 U.S.C. § 3553; *United States v. Booker*, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark." *United States v. Peebles*, 624 F.3d 344, 347 (6th Cir. 2010).

Once the Court calculates a defendant's Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by the Probation Office and the parties. *Peebles*, 624 F.3d at 347. These factors include, among others: (a) the nature and circumstances of a defendant's offense and his history and characteristics; and

(b) the need for the sentence contemplated to, among other things: (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of the defendant.

The Section 3553(a) factors support a Guidelines-range sentence for Bregenzer of 97–121 months in custody. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a), discussed further below.

### A. Nature and Circumstances of the Offenses

Bregenzer's conduct is serious. As the largest individual owner of KAC, he led an enterprise that defrauded government-funded health care benefit programs designed to help vulnerable patients. More than anyone else, Bregenzer set the tone at the top of KAC, fostering a culture that encouraged fraudulent billing to increase profits. Bregenzer's focus on profits was particularly acute as he positioned KAC for sale to a larger entity, which he hoped would result in a "multi-million dollar payday for all of us." GX 466; R. 252 at 2637:3–4. Indeed, as noted above, Bregenzer's push for revenue meant that, despite his lack of medical qualifications, he directed KAC employees to conduct unnecessarily lengthy counseling sessions or see patients more frequently than necessary.

Additionally, as noted above, when employees pushed back or raised concerns, Bregenzer defended KAC's practices, or simply disregarded the issues brought to his attention. *See* R. 244 at 1819–22, R. 244 at 1824–28 (McCutcheon); R. 255 at 2816–18 (Skaggs); R. 255 at 2951–52 (Kyle). Shortly after Dr. McClain joined KAC, she convened a call with the owners including Bregenzer and raised (a) Alzadon treating Dr. Ricardo's patients;[2] (b) Alzadon and KAC

---

[2] R. 245 at 2061:18–25

employees charting, billing, and prescribing on behalf of Dr. Ricardo;[3] and (c) KAC's billing for smoking cessation counseling that never happened.[4] But, after the call, Dr. McClain was forced out and as Berry testified, she and Bregenzer "didn't fix anything." R. 252 at 2641:7–11. Indeed, Berry and Bregenzer agreed that they would "stick together" and "say we knew nothing about it" if KAC's misconduct was uncovered. R. 252 at 2550. As Berry testified, Bregenzer knew that self-reporting—or otherwise fixing the issues—would reduce KAC's sale price and payout to the owners, himself included. R. 252 at 2605:4-6.

In short, Bregenzer was the primary beneficiary of KAC's misconduct, and defended and enabled KAC's fraudulent practices. He abused government health care reimbursement systems based on trust. Bregenzer's disregard for those taxpayer-funded systems not only erodes their integrity, but also consumed significant resources to uncover, investigate, and prosecute.

### B.  <u>History and Characteristics of Bregenzer</u>

Per the PSR, Bregenzer had a supportive upbringing. PSR at ¶ 71-72. Bregenzer attended Louisiana State University for his bachelor's degree, and has worked for larger corporations, start-up companies, and as an independent consultant. *Id.* at ¶ 79-81.

Despite his successes and demonstrated ability to earn a living legally, Bregenzer chose to exploit government-funded health care programs. There is no justification for Bregenzer's criminal conduct, which harmed the public fisc and KAC patients. Accordingly, Bregenzer's history and characteristics favor the imposition of a custodial, Guidelines-range sentence.

---

[3] R. 245 at 2058:19–2059:5.
[4] R. 245 at 2076–88 (Dr. McClain) and R. 260 at 3971:20–3978:22 (Fletcher)

## C. Deterrence, Promoting Respect for the Law, and Punishment

A Guidelines-range sentence is appropriate for the seriousness of Bregenzer's criminal conduct and justly punishes him for that conduct. *See* 18 U.S.C. § 3553(a)(2)(A). It will also deter others from engaging in similar illegal conduct. 18 U.S.C. § 3553(a)(2)(B) (requiring district court judges to impose a sentence that affords adequate deterrence, both specific and general). In sentencing crimes which are more "rational, cool, and calculated" rather than "sudden crimes of passion or opportunity," a central consideration is the need for general deterrence. *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014).[5] Fraudulent billing by health care companies remains a significant problem throughout the United States. Accordingly, general deterrence should be a primary consideration here. The requested sentence shows others, especially those in ownership or senior positions, that creating a medical business that overbills and exploits government-funded programs is not worth the risk of incarceration. *See United States v. Barbara*, 683 F.2d 164, 167 (6th Cir. 1982) (holding it was well within the district court judge's discretion to consider societal retribution and the general deterrence factors as the most important in sentencing the defendant).

The requested sentence is also sufficient to promote respect for the law. Bregenzer disregarded multiple warnings, choosing to prioritize fraudulent profits over KAC's patients. His conviction and sentence should show that compliance with the law is non-negotiable.

## D. Avoiding Unwarranted Sentencing Disparities

The recommended sentence, which is within the Guidelines range, best serves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been

---

[5] As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for white collar criminals to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business." S. Rep. No. 98–225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259.

19

found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Sentencing within the Guidelines range avoids "creat[ing] a potential disparity in sentence for those convicted of [the same crime] in [one state], and across the country, based on little, if anything, more than the luck of which judge is assigned to a particular case." *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007). Indeed, one of the central reasons for creating the Guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *Musgrave*, 761 F.3d at 609.

## IV.    RESTITUTION, FORFEITURE, AND OTHER MATTERS

### A. Restitution

Based on the paid amounts associated with each of the above three categories used to calculate the loss amount (and consistent with the PSR), the total restitution amount collectively owed by Alzadon, Bregenzer, and Vanhoose is $812,881.09, which includes $556,033.21 to Kentucky Medicaid and $256,847.88 to Medicare. The Government respectfully suggests that liability for restitution should be joint and several between the Defendants.

### B. Forfeiture

The Government respectfully submits that Bregenzer's forfeiture amount should be $325,152.44. Evidence at trial established that Bregenzer owned 40% of KAC and made more than $400,000 annually from KAC during the course of the conspiracy. *See* R. 252 at 2539:18—2540:4. Based on the Government's same conservative methodology for calculating the loss and restitution amounts in this case, KAC collected $812,881.09 in fraudulent proceeds. As explained in more detail in the government's Motion for Preliminary Order of Forfeiture for Forfeiture Money Judgment, R. 326, and Reply in further support of its motion, R. 350, Bregenzer should be required to forfeit his 40% of the fraudulent proceeds, $325,152.44.

20

## C.  **Special Assessment**

Per 18 U.S.C. § 3013, a special assessment of $1,000 is to be assessed against Bregenzer.

## D.  **Supervised Release**

Because Bregenzer was convicted of a Class C felony, the government is requesting a three-year term of supervised release.  The government respectfully suggests that Bregenzer's persistent fraudulent conduct, despite multiple warnings from his employees, warrants a three-year term of supervised release. The government also requests that the Court impose a special condition requiring Bregenzer to provide his probation officer with any requested financial information, consistent with the PSR.

## CONCLUSION

For the foregoing reasons, the Government respectfully recommends that this Court: (1) sentence Bregenzer to a term of imprisonment consistent with the Guidelines range; (2) order a special assessment of $1,000; (3) impose a forfeiture judgment of $325,152.44; and (4) require Bregenzer to satisfy his restitution obligation of $812,881.09.

Respectfully submitted,

JASON PARMAN
First Assistant U.S. Attorney

LORINDA LARYEA
CHIEF, FRAUD SECTION

*/s/ Sarah E. Edwards*
Sarah E. Edwards
Dermot W. Lynch
Abdus Samad Pardesi
Trial Attorneys
Fraud Section, Criminal Division

21

## **CERTIFICATE OF SERVICE**

On April 10, 2026, I electronically filed the foregoing through the ECF system, which will send the notice of electronic filing to all counsel of record.

/s/ *Sarah E. Edwards*_____
Trial Attorney

22