UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CRIMINAL ACTION NO. 5:23-cr-00009-KKC

*ELECTRONICALLY FILED*

UNITED STATES OF AMERICA                                      PLAINTIFF

v.

JOSE ALZADON, ET AL.                                        DEFENDANT

---

**DEFENDANT MICHAEL BREGENZER'S
SENTENCING MEMORANDUM**

---

Ronald W. Chapman II, Esq., LL.M.
MI Bar No. P73179
(Admitted Pro Hac Vice)
THE CHAPMAN FIRM
456 E. Milwaukee Ave.
Detroit, Michigan 48202
T: (346) 242-7626
ron@chapmanandassociates.com

John J. Dowling III.
NC Bar No. 57517
(Admitted Pro Hac Vice)
DOWLING DEFENSE GROUP LLC
6201 Fairview Road, Suite 200
Charlotte, North Carolina 28210
Ph: 631-574-7905
E: john@dowlingdefensegroup.com

*Counsel for Defendant Michael Bregenzer*

1

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 3

RELEVANT PROCEDURAL BACKGROUND ................................................................. 5

ARGUMENT...................................................................................................................... 6

    I.   The Sentencing Guidelines. ................................................................................. 6

        A.  The PSR incorrectly calculates and overstates the loss amount. ................................. 6

            1.   The loss amount calculation is incorrect. ............................................................. 6

            2.   The PSR's upcoding loss calculation fails to account for legitimate services. ....... 7

        B.  The 2-level enhancement for over $1,000,000 in loss to a federal health care program does not apply. ............................................................................................................ 8

        C.  The Government cannot meet its burden to prove the four-level organizer/leader enhancement. ............................................................................................................ 8

            1.   The Government has not proven that there were more than five participants. ........ 9

            2.   The "otherwise extensive" component of the organizer/leader enhancement is "grievously ambiguous" and the Court should reject it on lenity grounds. ............ 9

    II.   The Court should vary downward under 18 U.S.C. § 3553(a). ........................................11

        A.  The history and characteristics of Mr. Bregenzer counsel in favor of a below-Guidelines sentence. ................................................................................................. 12

            1.   Family impact. ................................................................................................. 12

            2.   Faith and church involvement. ......................................................................... 14

            3.   Professional Engagement .................................................................................. 15

            4.   The Community and Mr. Bregenzer's Impact .................................................... 17

        B.  A sentence of 18 months affords adequate deterrence. ............................................. 18

            1.   There is no need for specific deterrence. ........................................................... 18

            2.   A sentence of 18 months is sufficient to deter similarly situated clinic owners from exaggerating the nature of medical treatment. ........................................... 19

        C.  A sentence of 18 months promotes sentencing parity for those similarly situated.… 20

        D.  … whereas a sentence of 97-121 months is unreasonably severe. ............................ 24

        E.  A sentence of 18 months is consistent with the seriousness of the offenses. .............. 25

        F.  The nature and circumstances of the offense. ........................................................... 26

    III.   Supervised release in unnecessary in this case. ............................................................... 28

CONCLUSION................................................................................................................. 29

CERTIFICATE OF SERVICE ......................................................................................... 29

**INTRODUCTION**

Michael Bregenzer is the man who "shows up."  Kendall Bregenzer Letter, p. 4.  From hurricane relief, to fixing houses for widowed women, to paying for cancer treatments, to transporting the elderly to medical appointments, he often "noticed and cared for" others without drawing attention to himself.  *See* Janis Jenson Letter, p. 9.  His "consistent source of help" was manifest even when inconvenient for him personally.  *See* Patresa McGown Letter, p. 7.  The scores of character letters from those in his church capture his enduring relationship with other parishioners, his unbending and inveterate service to others, and his faith in God.  He is undoubtedly a pillar of hope and support for everyone with whom he interacts.

That same motivation to help others drove him to establish Kentucky Addiction Centers in 2017.  Now, in stark contrast to the rest of Mr. Bregenzer's life pursuits and charitable works, he stands convicted of non-violent, fraud-related offenses for which the federal Government seeks to imprison him for over *eight years*.  ECF No. 355 at 1 (Gov't Sent. Memo.).  Eight years translates to dozens of missed birthdays; dozens of absent holidays; years and years of missed family gatherings; episodes of lost family love and affection; eight Christmases; eight warm summers; and far more.  Devastating.

The Court should reject that recommendation, which is based on an incorrect calculation of the advisory Guidelines, and sentence Mr. Bregenzer to 18 months followed by no period of supervised release.

First, as previewed above, Mr. Bregenzer has a record—a record of positive, charitable works for which he almost never received any personal benefit other than enjoyment in helping others.  His history and characteristics, including his charitable works, selflessness, and lack of

prior involvement with the justice system, counsel in favor of a below-guidelines sentence. 18 U.S.C. § 3553(a)(1).

Second, a sentence of 18 months is "sufficient, but not greater than necessary" to afford adequate deterrence to future criminal conduct. 18 U.S.C. § 3553(a)(2)(B)-(C). On specific deterrence, there is no need for an incarcerative sentence at all. Mr. Bregenzer has never offended before, has complied with all conditions of pre-trial release, and is unlikely to reoffend. On general deterrence, the Government's demand for a sentence of *eight years in federal prison* is far "greater than necessary" to communicate to the general public that overbilling the federal government, exaggerating the extent of care, or taking shortcuts with NPI numbers is not "worth it." Third, a sentence of 18 months also avoids unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a)(6). The comprehensive data compilation captured below demonstrates that a sentence of 18 months is squarely in the heartland of sentences for those similarly-situated. That data reflects the growing and acknowledged fact that the loss table in USSG § 2B1.1—which is the gravamen of the Government's and Probation's sentencing recommendation—tend to be a terrible proxy for moral culpability. Indeed, the data from the Sentencing Commission shows that courts in this Circuit vary downward in these types of cases 50% of the time (in 2025). *See* Figure C, *infra*. Nationwide, courts in these types of cases vary downward in 30% of the time (in 2025). *See* Figure E, *infra*.

A sentence of over eight years, by contrast, would result in an unwarranted sentencing disparity—and would be unreasonably severe on its own terms. As described below, if Mr. Bregenzer had been convicted of a sex offense involving a minor, his sentence *would be lower than what the Government is seeking*. The Supreme Court has explained that, generally, "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem v. Helm*, 463 U.S. 277, 291 (1983).

4

*  *  *

For these reasons and others described below, Mr. Bregenzer respectfully requests that the Court reject the Government's unreasonably harsh sentencing recommendation, reject a ritualistic application of the advisory and overly punitive loss Guideline, and sentence him to a period of 18 months.

## RELEVANT PROCEDURAL BACKGROUND

From 2017 to 2022, Mr. Bregenzer was the majority owner of a series of pain management clinics in Kentucky.  PSR ¶ 7.  During that time, he worked with a series of individuals, including co-defendants Barbie Vanhoose, Dr. Ricardo Alzadon, and Kristy Berry.  After the DEA began to suspect that KAC was overbilling the federal government, it began an investigation and executed search warrants.

A grand jury sitting in this district returned a fourteen-count Superseding Indictment charging Mr. Bregenzer and his co-defendants variously with conspiracy to commit health care fraud, 18 U.S.C. § 1349, nine counts of health care fraud, § 1347, two counts of aggravated identity theft, 18 U.S.C. § 1028A, and conspiracy to distribute controlled substances unlawfully, 21 U.S.C. § 846.  ECF No. 87.  Defendant Kristy Berry pled guilty to Count One and cooperated with the Government.  The case proceeded to trial, and the jury convicted Mr. Bregenzer of all charged counts against him.

Probation prepared a PSR that calculates Mr. Bregenzer's offense level as follows:

| Guideline | Provision | Offense Level |
|---|---|---|
| Base Offense Level for § 1349 | § 2B1.1(a)(2) | 6 |
| Loss Amount Enhancement | § 2B1.1(b)(1)(J) | +18 |
| Fed. H/C Fraud Offense >$1m | § 2B1.1(b)(7)(A) | +2 |
| Organizer/Leader | § 3B1.1(a) | +4 |
| Total Offense Level | | 30 |

5

## ARGUMENT

**I.      The Sentencing Guidelines.**

      **A.      The PSR incorrectly calculates and overstates the loss amount.**

            **1.      The loss amount calculation is incorrect.**

The loss amount under USSG § 2B1.1(b)(1) is overstated and not supported by the PSR's Methodology in Paragraphs 37–38, 46.  The PSR treats "loss" as the aggregate billed amounts for smoking cessation counseling (99406) and office visits billed under codes (99213) and (99214), totaling $4,883,397.03.  *Id.*  At the outset, smoking cessation was capped at 8 times per year (99406 and 99407).  This means that the most that could be obtained by the practice was less than $90 per patient per year.  Jose and Ricardo Alzadon had no more than 500 patients, even according to the Government's estimates, which amounts to no more than $100,000 per year.  Regardless, the PSR treats each smoking cessation code billed as if it were actually paid.  This is inappropriate because it would have been impossible for Medicaid to pay more than $100,000 for smoking cessation, and the actual paid amount is much lower.

Paragraph 37 of the PSR claims the loss is $722,457.00 for the billed amount of smoking cessation codes and $2,423,486.84 for all office visits billed under code 99214 to Medicare and Medicaid.  The third amount, $1,737,435.19  which is the total billed amount of 99213 codes billed to Medicare and Medicaid by *Ricardo Alzadon is inaccurate*. ¶ 37. The Government's claims data shows only $926,000 of billed 99213 codes attributable to *Ricardo Alzadon*. There is an $800,000 discrepancy between the Government's claims data for Medicare and Medicaid evaluation and management codes billed by Ricardo Alzadon.  The PSR has no explanation for this and is in error.

6

**2.      The PSR's upcoding loss calculation fails to account for legitimate services.**

Next, the PSR incorrectly categorizes all upcoded claims as part of the loss amount. PSR ¶ 31. For upcoding-type conduct, the guideline "loss" is ordinarily the overpayment differential (what the program paid minus what it would have paid had proper coding occurred)—not the full billed amount for every office visit coded 99213 or 99214. The PSR does not compute the differential, does not credit any legitimate services, and does not identify which claims were entirely fictitious versus merely miscoded. Indeed, the Government's theory in this case has never been—not could it have been—that *every* single claim was based on illegitimate or non-existent care.

Instead, now, the Government's theory is that the entire billed amount (under all three codes) counts towards the loss amount because the fraud at KAC was "pervasive." ECF No. 355 at 7 (citing *United States v. Betro*, 115 F.4th 429, 454-55 (6th Cir. 2024)). In *Betro*, the Sixth Circuit held that fraud is pervasive when "separating legitimate from fraudulent conduct is not reasonably practicable." 115 F.4th at 455 (citation and quotation marks omitted). If, but only if, the Court makes that threshold finding, does "the burden then shift[] to the defense to prove the specific amount by which that amount should be reduced." *Id.* at 454 (citation and quotation marks omitted).

Here, it *is* "reasonably practicable" to determine the amount of loss, and the Court should not conclude that the fraud was pervasive. The Government could have proven at trial—or now at sentencing—the number of patients who did not receive any treatment at all by interviewing them. But it did not. The burden does therefore not shift to Mr. Bregenzer merely because the Government characterizes KAC as a pervasive fraud. The Government cannot evade its burden

of proof by taking the shortcut of labeling the overbilling as too complicated because there *are* methods to prove a specific loss amount.

### B. The 2-level enhancement for over $1,000,000 in loss to a federal health care program does not apply.

The PSR's erroneous loss calculation under USSG § 2B1.1 has the compounding effect of triggering the 2-level enhancement for over $1,000,000 in loss to a federal health care program. *See* PSR ¶ 46; USSG § 2B1.1(b)(7). Because the correct actual loss amount to Medicare and Medicaid is $812,881.09, not over $4,000,000, this enhancement does not apply.

Section 2B1.1(b)(7) calls for a 2-level increase in the offense level if (a) the defendant was convicted of a federal health care offense involving a government health care program and (b) the loss under § 2B1.1(b)(1) was more than $1,000,000. Here, as described above, the Government cannot meet its burden to prove that the loss amount exceeded that threshold.

Therefore, the enhancement under section 2B1.1(b)(7) does not apply.

### C. The Government cannot meet its burden to prove the four-level organizer/leader enhancement.

The 4-level organizer/leader enhancement does not apply because the Government cannot meet its burden to prove five or more participants, nor can it prove that the health care fraud scheme was "otherwise extensive."

Section 3B1.1 of the Guidelines calls for an amplified offense level if the Government can prove by a preponderance of the evidence that the defendant occupied an outsized role in the commission of the offense, largely based on the offender's supervision, direction, or control of other "participants" in the scheme. *See* USSG § 3B1.1. The enhancement also ostensibly applies if the Government can prove that the scheme was "otherwise extensive." *Id.* at § 3B1.1(a). The key to this guideline is the definition of "participant." The application notes define a participant

as "a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense . . . is not a participant." App. n.1 to USSG § 3B1.1.

> **1.** **The Government has not proven that there were more than five participants.**

Here, the Government has failed to meet its burden to prove that the health care fraud scheme involved five or more participants. True, Bregenzer and his three co-defendants were convicted of the health care fraud conspiracy—but that only makes four, not five participants. The Government's attempt to bootstrap the Court's threshold admissibility findings from trial under Federal Rule of Evidence 104(a) as "proof" of more than five participants fails. *See* ECF No. 355 at 12-13.

The Government claims that the Court "found at trial" that Trouper Krueger and Kristi Elrod "were also members of the conspiracy." *Id.* At trial, the Court merely made a threshold finding of admissibility under Rule 104(a) to determine if statements were considered hearsay under Federal Rule of Evidence 801(d)(2)(E) and *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978). *See* ECF No. 263 at 272-73 (trial transcript). The Court did *not* conclusively find that Trouper Krueger or Kristi Elrod were "members of the conspiracy," as the Government characterizes. *See* ECF No. 355 at 13. The Government has not met, and cannot meet, its burden to prove that Mr. Bregenzer organized or led five or more co-conspirators.

> **2.** **The "otherwise extensive" component of the organizer/leader enhancement is "grievously ambiguous" and the Court should reject it on lenity grounds.**

In addition to the number of participants, section 3B1.1 calls for a leadership adjustment "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants *or was otherwise extensive*." USSG § 3B1.1(a) (emphasis added). The

Congressionally-approved *Guidelines* do not define "otherwise extensive"; only the Application Notes do. *See* App. n.3 to USSG § 3B1.1. Because the phrase "otherwise extensive" is "grievously ambiguous," the Court must reject its application on lenity grounds.

"In this circuit, the rule of lenity applies when interpreting the Guidelines." *United States v. Henry*, 819 F.3d 856, 871 (6th Cir. 2016). "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *United States v. Castleman*, 572 U.S. 157, 172-73 (2014).

As the Government points out, the Sixth Circuit has had to devise an atextual, three-part factors test for district courts to consider in determining whether criminal activity was "otherwise extensive" under section 3B1.1. ECF No. 355 at 13 (citing *United States v. Anthony*, 280 F.3d 694, 700-701 (6th Cir. 2002)). In *Anthony*, the Sixth Circuit held that courts must conduct an analysis of three factors: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." 280 F.3d at 701. This framework *itself* is ambiguous and borderline incoherent; it is not susceptible to meaningful replication and consistent application.

Further, to the extent the *Anthony* factors test focuses on "the number of knowing participants," 280 F.3d at 701, the Sixth Circuit misinterpreted the phrase "otherwise extensive." The text of section 3B1.1(a) already accounts for the number of participants by expressly stating so. To interpret the latter phrase—"otherwise extensive"—as referring to the number of participants would result in a superfluous reading of the guideline, a result courts have long and forcefully cautioned against. *E.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (holding that "[i]t

10

is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up).

As a result, to the extent the Government relies on the "otherwise extensive" component of section 3B1.1(a) to meet its burden to trigger application of the adjustment, the Court should decline to apply it here on the grounds that the phrase itself is "grievously ambiguous," and that the rule of lenity prohibits its application.

## II.   The Court should vary downward under 18 U.S.C. § 3553(a).

The task of crafting an individualized sentence rests almost exclusively in the province of district courts. Within the boundaries of the vast kinds and degrees of punishments established by Congress for Mr. Bregenzer's offenses of conviction, this Court has "extremely broad discretion" to impose a sentence that it finds "sufficient, but not greater than necessary" to advance the statutory goals of federal sentencing. *United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011); 18 U.S.C. § 3553(a). A sentencing court's role of making an "individualized assessment" of the offender before it, *Gall v. United States*, 552 U.S. 38, 49-50 (2007), is informed by the tradition that "the punishment should fit the offender and not merely the crime[,]" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

Because there is no mandatory minimum sentence for the counts of conviction, this Court has wide latitude to design an appropriate sentencing package "to effectuate its sentencing intent." *Pepper*, 562 U.S. at 507. In designing that package, the Supreme Court has instructed that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. But the section 3553(a) factors remain the backbone of this Court's "final determination." *Spears v. United States*, 555 U.S. 261, 265 (2009).

11

A.      **The history and characteristics of Mr. Bregenzer counsel in favor of a below-Guidelines sentence.**

Mr. Bregenzer did not start KAC with the sole intention of generating profit, but from a genuine desire to help and support those who are struggling and in need.  Countless times, Mr. Bregenzer demonstrated his willingness to place the needs of his family, employees, and community above his own—often at significant personal and financial cost—and in doing so, left a lasting and meaningful impression on those around him.  Through his lifelong commitment to his family, his faith, his employees, and his broader community, Mr. Bregenzer has consistently demonstrated that he is not driven recognition, but by compassion and a sincere desire to help others through emotionally and financially difficult circumstances.  The letters attached hereto attest to these characteristics.

1.      **Family impact.**

The letters from Mr. Bregenzer's family reflect a consistent pattern of selflessness that began in childhood and continues today.  Raised in a close-knit, faith-centered household—where his father served as a minister and continues his work with the Salvation Army, and his mother, who also worked there, recently retired—Mr. Bregenzer was instilled early with the value of serving others.  *See* Peggy Snell Letter, p. 3.[1]  His mother describes him as someone for whom "there is nothing this man won't do for a person in need," a sentiment borne out through decades of conduct.  *Id.*

As a young man, Mr. Bregenzer demonstrated this instinct to care for others.  In high school, he befriended a new student struggling to find her place, encouraging her and helping her build confidence—support that left a lasting impact on her life.  *Id.*  Later, during Hurricane

---

[1] All of the character letters are captured in a single PDF filed contemporaneously as Exhibit A.

12

Harvey, Mr. Bregenzer led family members and neighbors through dangerous conditions to safety and opened his home to those displaced by the storm. *Id.* His commitment to others continued throughout his life: he and his wife regularly delivered meals and gifts to an individual suffering from Guillain-Barre Syndrome, ensuring that he was not left without support. *Id.*

His wife, Rachel Bregenzer, describes Mr. Bregenzer as a man with a "generous heart" and "deep compassion," who consistently placed the needs of others before his own—even during times of financial strain. Rachel Bregenzer Letter, pp. 1-2. She recounts that he volunteered to assist elderly individuals with household tasks without accepting payment, paid for an employee's funeral so the family could grieve without financial burden, continued paying an employee although she had no paid time off during cancer treatment, and even provided housing in his camper so another employee could access care in Houston. *Id.* at p. 1.

Within his own household, Mr. Bregenzer's commitment was equally unwavering. He served as the primary provider and worked tirelessly to ensure stability and opportunity for his children, supporting one daughter in her pursuit of a mechanical engineering degree and another as she prepares for marriage. *Id.* at p. 2. His daughter describes him as someone who "shows up"—a defining characteristic demonstrated by never missing a single softball game over fifteen years, often arriving straight from work, and consistently prioritizing time with his children regardless of personal hardship. Kendall Bregenzer Letter, p. 4. This same commitment is reflected in the values Mr. Bregenzer instilled in his children—hard work, responsibility, and the importance of being present for those you love—demonstrated through his consistent involvement in their lives, from coaching sports and helping with schoolwork to prioritizing family while continuing to serve others beyond his own household. Kaitlyn Bregenzer Letter, p. 26.

13

Mr. Bregenzer's identity as a husband, father, and son is grounded in reliability, sacrifice, and a lifelong commitment to others—ensuring that no one in his family or community is left to face hardship alone.

### 2. Faith and church involvement.

Mr. Bregenzer's faith is not merely personal; it is expressed through consistent, tangible service to others. As a regular church attendee and board member, he has repeatedly stepped into difficult and often emotionally taxing situations to support members of his church community.

A pastor of his church, Regeneration Church, recounts that Mr. Bregenzer provided financial assistance to families battling cancer, performed extensive home repairs for widowed women, and offered both employment and emotional support during times of personal crisis. Kevin McGown Letter, p. 6.

This assistance was often done without recognition. One church member noted that Mr. Bregenzer was a "consistent source of help" even in inconvenient and emotionally difficult situations, organizing disaster relief efforts and assisting vulnerable individuals without expectation of acknowledgment. Patresa McGown Letter, p. 7.

Others emphasized that Mr. Bregenzer's kindness was often quiet and intentional—ensuring others felt "noticed and cared for" without drawing attention to himself. Janis Jenson Letter, p. 9. This pattern reflects not only generosity, but humility—an individual motivated by service rather than recognition.

Beyond these examples, members of his church consistently describe Mr. Bregenzer as someone who shows up during life's most difficult moments. He has provided emotional support and guidance to individuals navigating divorce, offering encouragement that helped rebuild their lives and families, and has remained present for others through the loss of loved ones, offering

both practical assistance and steady support in times of grief.  David Shepard Letter, p. 14; Bryon Fox Letter, p. 11.  He also routinely assists with practical needs, including repairing homes, transporting elderly members to medical appointments, and addressing everyday hardships without hesitation.  Kevin McGown Letter, p. 6; Kimberly Hawkins Letter, p. 25.

In many instances, Mr. Bregenzer's acts of service extend into deeply personal moments. One church member recounts that during a particularly difficult period following a divorce, Mr. Bregenzer went out of his way to support her family by taking her child to multiple stores to gather gifts and surprise their mother at Christmas—an act of kindness that brought comfort during an otherwise painful time.  Laura Shepard Letter, p. 28.

Others similarly describe Mr. Bregenzer as someone who instinctively recognizes when help is needed and steps in without being asked—whether by ensuring a neighbor had power during a storm outage, quietly paying for meals, or assisting families through transitions and hardship.  Janis Jenson Letter, p. 9; Lacey Prickett Letter, p. 27; Christina Dennis Letter, p. 31.

These accounts reflect a consistent and deeply ingrained pattern of service, one in which Mr. Bregenzer not only responds to need, but anticipates it.  His actions within his church community demonstrate a sustained commitment to lifting others through some of the most challenging moments of their lives.

### 3.	Professional Engagement

Perhaps most telling of Mr. Bregenzer's character is how he treated those who worked for him and the patients KAC served. The letters from former KAC employees reflect that Mr. Bregenzer fostered a workplace culture rooted not in profit, but in compassion, dignity, and genuine care for others.

Employees consistently describe Mr. Bregenzer as someone who treated people, regardless of their personal circumstances, as individuals—not transactions or addicts—guided by a philosophy of "treating the whole person, not just getting someone to a place of compliance." Jimmy Arnet Letter, p. 18. Ensuring the patients were guided and provided with the support services they needed to maintain recovery was always Mr. Bregenzer's utmost priority.

He ensured emotional and professional support during times of crisis—offering grief counseling, peer-support, maintaining employment for struggling individuals, and organizing efforts to support both employees and patients in times of need despite the cost to the company. Jimmy Arnet Letter, pp. 18-20. In one instance, following the unexpected death of a KAC employee, Mr. Bregenzer immediately flew in and paid for the funeral, ensured continued support for affected patients of the employee, and ensured that employees were provided with counseling, time off, and continued support during the aftermath. *Id.*

Employees describe him as fostering trust in environments that are often emotionally demanding. Brandon Lewis Letter, p. 13. They consistently emphasize that Mr. Bregenzer treated both employees and patients "like family," creating an environment where individuals felt supported not only professionally, but personally. Macon Bradley Letter, p. 24. This approach extended beyond the workplace—Mr. Bregenzer took the time to know employees' families, checked in during times of personal loss, and remained present during difficult life events. Kayla Smith Letter, p. 22; Macon Bradley Letter, p. 24.

Mr. Bregenzer's commitment to those he served extended into broader community and patient-focused efforts. Employees noted his active involvement during Recovery Month, where he encouraged outreach and personally contributed to initiatives supporting individuals struggling with addiction and recovery. Kayla Smith Letter, p. 22; Denny Wendell Letter, p. 23. Even in his

own moments of difficulty, Mr. Bregenzer remained focused on the well-being of others—supporting employees recovering from medical procedures, participating in community drives to provide essential items such as coats and food, and continuing to prioritize the needs of those around him. Melissa Eggers Letter, p. 29.

These are not the actions of an individual motivated by financial gain; they reflect a leader who consistently prioritized people over profit, and who viewed his role not simply as an employer, but as a source of stability, support, and care for those who depended on him.

### 4. The Community and Mr. Bregenzer's Impact

Beyond his family and workplace, Mr. Bregenzer's impact extends deeply into his broader community. Across numerous letters, a consistent theme emerges: Mr. Bregenzer shows up, especially when others are struggling. Friends, neighbors, and community members repeatedly describe him as someone who steps in whenever "because he saw a need." Bryon Fox Letter, p. 11.

This reflects a consistent instinct to help others across a broad range of impactful situations. He has mentored individuals through business challenges, mobilized and provided support for charitable causes, and provided practical assistance—from home repairs to transportation—without hesitation or expectation of return. Allen Reagan Letter, p. 15; Holly Snell Letter, p. 16; Christina Dennis, p. 31; Bryon Fox Letter, p. 11. Notably, he helped lead a community-wide fundraising effort that raised over $70,000 to support a young girl's life-saving surgery following a traumatic brain injury—an effort that reflects his willingness to act decisively when others are in crisis. Holly Snell Letter, p. 16.

One individual summarized his impact best, noting that Mr. Bregenzer makes "the welfare and happiness of others a priority in his life" and leaves a "lasting mark on the lives of many."

Allen Reagan Letter, p. 15. Even in the midst of his own legal challenges, Mr. Bregenzer continued to support others—maintaining his faith, offering encouragement, and remaining present for those in need.

*   *   *

The jury's verdict is profoundly inconsistent with the faith-based life Mr. Bregenzer has lived helping others. The Court should strongly consider these aspects of Mr. Bregenzer's history and characteristics in crafting an individualized sentencing package.

### B.      A sentence of 18 months affords adequate deterrence.

In imposing an appropriate sentence, the Court also considers the need for the sentencing package to afford adequate deterrence: both as to Mr. Bregenzer himself, and as to others who might contemplate replicating his offenses of conviction. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). Here, there is no need whatsoever for a sentence tailored to specific deterrence. And a sentence of 18 months is more than adequate to send a message to other clinic owners or practitioners that crime does not pay.

### 1.      There is no need for specific deterrence.

Specific deterrence becomes particularly relevant when an offender's personal history and characteristics suggest a heightened risk of reoffending. In Mr. Bregenzer's case, nothing suggests a probability or propensity to reoffend. To the contrary, his background, conduct, and lack of contact with the criminal justice system suggests that this was an anomaly. Mr. Bregenzer has complied with all conditions of pre-trial release for the last several years, both before and after the adverse jury verdict.

**2.    A sentence of 18 months is sufficient to deter similarly situated clinic owners from exaggerating the nature of medical treatment.**

A sentence of 18 months is sufficient, but not greater than necessary, to deter similar offenses.

Of course, courts can consider the deterrent effect that a particular sentence would have on the general public. *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010). But courts have recognized that section 3553(a) "does not [even] require the goal of general deterrence be met through a period of incarceration." *Id.* Quoting the legislative history of the Sentencing Reform Act, the Ninth Circuit has explained that "a sentence of imprisonment" is not the "only form of sentence that may effectively carry deterrent or punitive weight." *Id.* at n.9 (citation omitted).

A sentence of 97-121 months (or any sentence even close to that) is far "greater than necessary" to communicate to the general public that overbilling the federal government, exaggerating the extent of care, or taking shortcuts with NPI numbers is not "worth it."

The Government dramatically overstates the size of a sentence that is needed to advance Congress's general deterrence objective in section 3553(a)(2)(B). The Government points to legislative history for the proposition that "general deterrence is particularly important for white collar criminals to dissuade actors that small fines *or low sentences* can be dismissed as simply a cost of doing business." ECF No. 355 at 19 n.5 (citation omitted) (emphasis added). At the outset, a sentence of 18 months (what Mr. Bregenzer proposes) is hardly a "low sentence." We cannot fathom a scenario where the "rational, cool, and calculated" white collar offender, *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014), views 18 months away from his family as a "low sentence."

The Government correctly notes (ECF No. 355 at 19) that the Sixth Circuit has encouraged district courts to consider general deterrence in the context of sentencing white collar offenders. *See Musgrave*, 761 F.3d at 609. In *Musgrave*, the court held that in sentencing offenders for fraud-related offenses, general deterrence is especially important because these crimes are more "rational, cool, and calculated," and these offenders are more likely to weigh the risks of their conduct than those who commit crimes of passion. *See id.* The need to impose a sentence that deters those similarly situated does *not* mean the sentence needs to be unreasonably harsh. As Justice Kennedy observed in a speech some twenty years ago, sometimes "our punishments too severe, our sentences too long." Anthony M. Kennedy, Assoc. Justice, Supreme Court of the United States, Speech at the Am. Bar Ass'n Annual Meeting, (Aug. 9, 2003), https://rb.gy/ijv2no. Congress's goal of general deterrence would be adequately satisfied with a sentence of 18 months.

C.    **A sentence of 18 months promotes sentencing parity for those similarly situated…**

Section 3553 also requires the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). "Subsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007). The Sixth Circuit recently held that district courts are not *required* to consult national sentencing data of the sort captured by the Interactive Data Analyzer. *United States v. Hymes*, 19 F.4th 928, 935-36 (6th Cir. 2021). But the Sixth Circuit has given district courts broad discretion to at least consider the national data "as a starting point," and has "approved of district courts using the Commission's data during sentencing." *Id.* at 936 (citations omitted).

As the data shows, a sentence of 18 months would promote sentencing parity and would promote the Congressional sentencing policy objective codified in section 3553(a)(6).

The Sentencing Commission's Interactive Data Analyzer shows that, in 2025, 37 individuals were sentenced in the Sixth Circuit for a health care fraud offense under USSG § 2B1.1. About 65% of those offenders were sentenced to less than two years in prison. Figure A, *infra*. Further, the average length of imprisonment for all 37 offenders was 23 months. Figure B, *infra*.

*Figure A—Distribution of Imprisonment Length for Offenders Sentenced in the Sixth Circuit for a Healthcare Fraud Offense Under USSG § 2B1.1 in 2025.*



*Figure B—Average Length of Imprisonment for Offenders Sentenced in the Sixth Circuit for a Healthcare Fraud Offense Under USSG § 2B1.1 in 2025.*



Likely recognizing that the loss amount enhancement tends to be a poor proxy for measuring moral culpability, courts in the Sixth Circuit often vary downward from the advisory guideline range for offenders sentenced for health care fraud under USSG § 2B1.1. *See* Figure C, *infra*. In 2023, courts in this Circuit varied downward in 30% of cases. *Id.* In 2024, courts in this Circuit varied downward in over 52% of cases. *Id.* And in 2025, courts varied downward in 50% of cases. *Id.*

*Figure C—Percentage of Variances/Within-Guidelines Sentences for Offenders Sentenced for Health Care Fraud Under § 2B1.1 in the Sixth Circuit*



These are statistics from the Sixth Circuit.  When considering national statistics, as the Sixth Circuit has instructed, *Simmons*, 501 F.3d at 623, the numbers favor Mr. Bregenzer even further.

Nationwide, the average sentence length for offenders convicted of a federal health care offense and sentenced under § 2B1.1 was 19 months in 2025.  *See* Figure D, *infra*.  Echoing the trend in the Sixth Circuit, the national trend has also been for courts to vary downward for those (a) sentenced for a federal health care offense, (b) under § 2B1.1, and (c) with a criminal history category of I.  *See* Figure E, *infra*.  In 2025, nationwide, courts imposed below-guidelines sentences in 30% of these types of cases.  *Id.*

*Figure D—2025 National Average Length of Imprisonment for Offenders Sentenced for Health Care Offenses Under USSG § 2B1.1*



**Sentence Length of Economic Offense Cases Over Time**
Fiscal Year 2015 - 2025

Guideline  All Economic Crime Guidelines

— §2B1.1, Sentence Length (Average Months)

Fiscal Year

Individuals sentenced under §§2B1.1 (Theft, Property Destruction, and Fraud Offenses), 2B1.4 (Insider Trading), 2B1.5 (Cultural Heritage Resources), 2B2.1 (Burglary), 2B3.1 (Robbery), 2B3.2 (Extortion), 2B4.1 (Bribery), 2B5.1 (Counterfeiting), or 2B5.3 (Copyright) are depicted in this figure. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2015 - 2025; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; §2B1.1 Offense Type: Healthcare; Criminal History: I; Career Offender Status: All

*Figure E—Percentage of Sentences Where Courts Imposed Below-Guidelines Sentences*



## D.    … whereas a sentence of 97-121 months is unreasonably severe.

Not only would a sentence of 97-121 months, as the Government asks for, result in an unwarranted sentencing disparity, it would also be unreasonably severe on its own terms.

Ninety-seven months is just over *eight years* in federal prison. The Supreme Court has explained that, generally, "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem v. Helm*, 463 U.S. 277, 291 (1983).

To illustrate how absurd it would be to sentence Mr. Bregenzer based on the PSR's sentencing calculation, consider what the sentence would be if he had committed a sexually disgusting crime or a violent crime. For example, if he had been convicted of disseminating child sexual abuse material, his sentence would be *lower* than what the Government is asking for. *See*

USSG § 2G2.2(a)(1) (offense level 18).  If he had sexually abused someone, his sentence would be on par with what the Government is asking for.  *See* USSG § 2A3.1(a)(2) (offense level 30).  As former federal Judge Paul Cassell has explained when conducting this exact comparative analysis, "[t]he irrationality of these differences is manifest and can be objectively proven."  *United States v. Angelos*, 345 F. Supp. 2d 1227, 1247 (D. Utah 2004), *aff'd*, 433 F.3d 738 (10th Cir. 2006).  The notion that Mr. Bregenzer is as culpable as a sex predator is irrational.

**E.      A sentence of 18 months is consistent with the seriousness of the offenses.**

The trend above—of varying downward in cases like this one—is only likely to continue, as courts continue to exercise their discretion to reject a ritualistic application of the fraud-loss guideline based on the growing judicial consensus that the loss tables in § 2B1.1 bear little or no connection to the seriousness of the offense or the offender's culpability.  For example, one district court has cautioned about the "utter travesty of justice" that can result from rigid application of the loss tables.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (recognizing "the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also United States v. Roen*, 279 F. Supp. 2d 986, 991 (E.D. Wisc. 2003) (imposing downward departure because loss table bore no resemblance to "economic reality.").

One district judge captured the landscape cogently in explaining that, "as the guidelines have become harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases."  Hon. Mark W. Bennett et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 IOWA L. REV. 939, 941-44 (2017).  Indeed, the Commission itself is in the process of amending the loss tables to respond to the chorus of concern among judges and practitioners.  *See* U.S. Sentencing Comm'n, Proposed Amendment

2 (Inflationary Adjustments), 90 Fed. Reg. 59,660 (Dec. 19, 2025); U.S. Sentencing Comm'n, 2026 Economic Offenses Data Briefing (Jan. 8, 2026, updated Feb. 5, 2026).

A sentence of 18 months is commensurate with the seriousness of exaggerating the extent of medical care in seeking a profit.

### F.        The nature and circumstances of the offense.

Finally, as part of the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), the Court should consider how much *good* Mr. Bregenzer and Kentucky Addiction Centers provided for addiction-afflicted patients throughout the area.  Although the jury's verdict reflects illegal conduct at KAC, it does not address all of the positive contributions KAC made.

Under 18 U.S.C. § 3553(a)(1), the Court must consider the nature and circumstances of the offense.  In *United States v. Moon*, 513 F.3d 527 (6th Cir. 2008), the Sixth Circuit upheld a below-guidelines sentence in a case where a physician had administered partial doses of chemotherapy while billing for full doses.  The court held that because "the fraud for which Defendant was convicted was part and parcel to the treatment rendered to her patients," the "proximity of the fraud to patient care was "an appropriate consideration for the district court to weigh as it determined the proper sentence." *Id.* at 543.  The court explicitly stated that "the fact that Defendant involved patient care in her fraud offenses separates her from others who may defraud the government by other means," and that "clearly, the proximity of the fraud to patient care is an appropriate consideration for the district court."

It has been said that "[a]ddiction is the only prison where the locks are on the inside." *Unknown*.  Another has described it this way: "Imagine trying to live without air. Now imagine something worse." *Unknown*.  Kentucky Addiction Centers helped scores of patients navigate the chains of these pains.

Narrated by Dennis Quaid, a short Viewpoint Educational Documentary highlighted the excellent work that Kentucky Addiction Centers was doing for the community.  In the segment, Mr. Bregenzer explains that "[t]he reason medication-assisted treatment programs are such a benefit is that we can diminish the physical side effects of opioid dependency, withdrawals, and the cravings, and you can actually lead a normal life."  *See* Kentucky Addiction Centers, Viewpoint Educational Documentary, available at https://tinyurl.com/4bfndvfu; *see also* Figure F.

*Figure F—Screenshot of Documentary Featuring Mr. Bregenzer Speaking About Opioid Addiction*



Mr. Bregenzer also explains that "we are blessed in the communities we work with to have a number of employers that have embraced a patient's journey to recovery."  *Id.*  As one Jimmy Arnett explains, "Mike believed that no one suffering from substance use was ever to[o] far gone that they could not be saved, because he believed in the value of life and giving people second chances."  Jimmy Arnett Letter, p. 2.

As part of these contributions to the community, KAC partnered with the McCracken County Sheriff's Office on the Badges of Hopes Initiative, a program that "allows those suffering with addiction the ability to seek help from the sheriff's office."  Critley King-Smith, *Badges of Hope*, Kentucky Law Enforcement Magazine (last visited Apr. 16, 2026), https://tinyurl.com/3s8d9ed5.

**III.    Supervised release in unnecessary in this case.**

Based on the offenses of conviction, Congress has authorized the Court to impose a term of supervised release of up to three years (for the health care conspiracy count). PSR ¶ 88; 18 U.S.C. § 3583(b)(2). In Mr. Bregenzer's case, supervised release is unnecessary.

There is no mandatory minimum term of supervised release required here. 18 U.S.C. § 3583(a) ("The court . . . *may* include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment.") (emphasis added). Thus, because no minimum term is required, the Guidelines call on the Court "to order a term of supervised release to follow imprisonment *when warranted* by an individualized assessment of the need for supervision." USSG § 5D1.1(b). Although not binding on this Court, the commentary to the Guidelines recommends making wise use of Probation's limited resources: "The statutory framework of supervised release aims to . . . [prevent] probation system resources from being wasted on supervisory services for releasees who do not need them." App. n.1 to USSG § 5D1.1 (citation omitted) (cleaned up).

Here, supervised release is neither necessary nor wise. As described above, Mr. Bregenzer does not have any pattern of offending and is broadly supported by his family members and his church. He has also complied with all conditions of release for several years, and has maintained a positive working relationship with pre-trial services. Any period of supervised release would be a waste of time and resources for the Court, Mr. Bregenzer, and Probation.

## CONCLUSION

The defense respectfully requests that the Court sentence Mr. Bregenzer to a term of imprisonment of 18 months.

Dated: April 16, 2026

Respectfully submitted,

s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.
MI Bar No. P73179
(Admitted Pro Hac Vice)
THE CHAPMAN FIRM
456 E. Milwaukee Ave.
Detroit, Michigan 48202
T: (346) 242-7626
ron@chapmanandassociates.com

s/ *John J. Dowling III.*
John J. Dowling III.
NC Bar No. 57517
(Admitted Pro Hac Vice)
DOWLING DEFENSE GROUP LLC
6201 Fairview Road, Suite 200
Charlotte, North Carolina 28210
Ph: 631-574-7905
E: john@dowlingdefensegroup.com

*Counsel for Defendant Michael Bregenzer*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing through the CM/ECF system on counsel for all parties.

This the 16th day of April, 2026.

*/s/ John J. Dowling III.*
John J. Dowling III.

29