**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL NO. 5:23-09-KKC-MAS-3** |
| **Plaintiff,** | |
| **v.** | **OPINION AND ORDER** |
| **MICHAEL BREGENZER,** | |
| **Defendant.** | |

This matter is before the Court on the government's motion (R. 326) for a preliminary judgment of forfeiture in which the government seeks a money judgment against Defendant Michael Bregenzer in the amount of $325,152.44. Bregenzer filed an objection to the motion, and the Court conducted an evidentiary hearing. For the following reasons, the Court will grant the motion.

Defendant Bregenzer was the CEO and majority owner of Kentucky Addiction Centers (KAC), a group of opioid addiction treatment clinics in Kentucky. Codefendant Barbie Vanhoose was a billing manager at KAC. Codefendant Dr. Jose Alzadon was a licensed medical doctor who worked at KAC. A jury found the defendants guilty of one count of conspiring to commit health care fraud, eight counts of healthcare fraud, and one count of conspiring to unlawfully distribute a controlled substance through the use of another person's DEA registration number.

At trial, the government presented evidence of three kinds of fraudulent billing by KAC:

1) KAC "upcoded," meaning it billed under a medical code (99214) that indicated it provided more medical services than it actually provided because Medicare reimbursed more for that code;
2) KAC billed under a medical code (99406) for counseling for smoking cessation when it did not provide those services; and
3) KAC represented to the payor that healthcare services were provided by Dr. Ricardo Alzadon when they were actually

- 1 -

performed by his son, defendant Dr. Jose Alzadon. The government presented evidence that KAC engaged in this kind of fraudulent billing because KAC representatives believed defendant Dr. Alzadon was not credentialed to bill certain insurers.

After trial and before Bregenzer's sentencing hearing, the government filed this motion for preliminary judgment of forfeiture requesting a forfeiture money judgment in the amount of $325,152.44 against Bregenzer. It arrives at this figure by calculating some of the amounts that KAC received in payments for the three kinds of fraudulent billing practices ($812,881.09) and multiplying that number by 40 percent, which was Bregenzer's ownership interest in KAC.

The $812,881.09 figure consists of:

1) $275,122.65 paid for services billed by both Dr. Alzadon and Dr. Ricardo under the 99214 code for more complex medical services;
2) $166,962.92 paid for services billed by both Dr. Alzadon and Dr. Ricardo under the 99406 smoking cessation code; and
3) $370,795.52 paid for medical services billed under the 99213 code for services purportedly provided by Dr. Ricardo.

Bregenzer filed an objection. The Court conducted an evidentiary hearing at which the government presented the testimony of one witness, and Bregenzer presented no evidence.

At the hearing, the Court ordered both parties to file, within 7 days, supplemental citations to the record and case law that would support their positions. (R. 386, Minute Entry.) The United States filed a post-hearing supplement. Bregenzer did not. Bregenzer did file an operating agreement in the record. (R. 389, Notice of Filing.)

Any person convicted of a federal health care offense must forfeit property that "constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). Any person convicted of a drug offense must forfeit "any property constituting or derived from any proceeds the person obtained, directly or indirectly, as the result

- 2 -

of such violation," 18 U.S.C. § 853(a)(1), and "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of" the violation. 18 U.S.C. § 853(a)(2).

In his response brief (R. 344) to the government's motion, Bregenzer presented three arguments against the money judgment amount requested by the government. He did not suggest any alternative amount for the judgment.

First, he argued that the government did not prove that all $812,881.09 paid to KAC were for fraudulent bills; he argued that some of the bills may have been for legitimate services. Second, he argued that the government relied on a demonstrative exhibit at trial (GX 82a) in calculating the amounts billed by Dr. Ricardo and that the exhibit does not constitute "evidence" for purposes of forfeiture. Finally, Bregenzer argued that the government must show that he personally obtained the proceeds of the offenses, not KAC.

As to Bregenzer's first objection—that the government must prove that every claim billed by KAC was fraudulent in order for the payment to be subject to forfeiture— the Sixth Circuit has determined, with regard to health care fraud, that in a "widespread business fraud scheme," everything can be attributable to fraud. *United States v. Jankowski*, No. 23-1404, 2024 WL 4554690, at *7 (6th Cir. Oct. 23, 2024) (citing *United States v. Smith*, 749 F.3d 465, 488 (6th Cir. 2014) and *United States v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010)). This is because the health care fraud forfeiture statute provides for forfeiture of even the indirect proceeds of the crime and, therefore, the term "proceeds" must be given "wide berth." *Id.*

Here, the evidence at trial showed that Bregenzer and KAC co-owner and codefendant Kristy Berry established a billing protocol that was designed to maximize billing revenue and profits at KAC above all else including the quality of healthcare provided. Bregenzer and Berry

entered into discussions to sell KAC. Both understood that the greater KAC's revenue, the more it would be worth. They acted accordingly. At one point, the sale price was $22 million.

The evidence established that the billing protocol imposed by Bregenzer and Berry to increase KAC's revenue included billing as though Dr. Ricardo was treating patients that Dr. Alzadon actually treated; billing all Medicare patients under the 99214 code whether that level of healthcare was provided or not; and billing for smoking cessation services whether they were provided or not and whether the patient needed those services or not. The entire billing operation was "permeated with fraud." *Id*. The fraud was so extensive that Bregenzer believed that, if KAC should be required to reimburse victims, that would "break the company," meaning they could not sell KAC.

Thus, even if KAC legitimately billed Medicare or Medicaid for some 99214-level services or smoking cessation counseling services or even if it legitimately billed for Dr. Ricardo's services at times because he actually provided the services, the Court should not "carve out" that "legitimate revenue from the fraudulent revenue" in determining the proceeds of the fraud. *Id*. It is all subject to forfeiture.

Bregenzer's second objection deals with the amounts paid for claims for Dr. Ricardo's services during the conspiracy. Bregenzer argues that the government's only proof of these amounts is a demonstrative exhibit used at trial (GX 82a), and he argues that a demonstrative exhibit is not evidence that the Court can rely on to calculate the forfeiture amount. However, the government entered the complete claims data into evidence at trial. (GX 620, 621.) Moreover, the government submits a declaration by Tara N. Wilson, a healthcare data administrator at the Kentucky attorney general's office, who states she reviewed the claims data contained in GX 620 and 621 and that the summaries of that data presented as Exhibits A and B to the reply are

accurate. (R. 350-1,350-2, 350-3.) Those exhibits indicate that, during the conspiracy, KAC billed Medicare and Medicaid a total of $1,737,435.19 under the 99213 code for services purportedly provided by Dr. Ricardo and that those entities paid KAC a total of $370,795.52 for those services. (R 350-2, 350-3.) Wilson testified to the same at the evidentiary hearing.

Finally, as to Bregenzer's third objection—that the government must show that Bregenzer personally "obtained" the proceeds, not KAC—the Court need not address this issue because the government presented evidence at trial that, between 2016 and 2020, Bregenzer personally received an annual salary of between $400,000 and $500,000 from KAC. (R. 252 Tr. 25-26.) These funds were "derived, directly or indirectly, from gross proceeds traceable to" KAC's fraudulent billing practices. 18 U.S.C. § 982(a)(7). Accordingly, Bregenzer must forfeit at least the $325,152.44 the government requests.

Moreover, in *Jankowsk*i, the defendant's companies received the $ 35.3 million in gross proceeds during the time of the health care fraud, not the defendant himself. 2024 WL 4554690, at *1. The court, however, imposed the forfeiture on Jankowski personally. *Id.* at *2. The Sixth Circuit did not discuss the rationale for imposing personal liability on the defendant so, perhaps, the issue was never raised. The Second Circuit, however, has addressed this issue and determined:

> [I]n the context of a criminal forfeiture proceeding under section 982, an individual "obtains" proceeds "indirectly" through a corporation when the individual so extensively controls, or dominates, the corporation and its assets that money paid to the corporation was effectively under the control of the individual. Factors that we think are likely to be relevant to this question include the individual's ownership interest; the level of control he exercised over the company; his authority to direct the disposition of corporate assets and the degree to which he exercised that authority; and the use of corporate assets for his personal expenses.

*United States v. Peters*, 732 F.3d 93, 103-04 (2d Cir. 2013) (cleaned up and citations omitted).

Bregenzer was the majority owner of KAC. Berry testified that Bregenzer knew everything going on at KAC "inside and out." (R. 252 Tr. 30.) The government presented evidence that Bregenzer and Berry intended to sell KAC. A company called BHG had offered to buy it for $22 million. The price was based on KAC's revenue. (R. 252 Tr. 106-07.) The higher KAC's revenue, the more it was worth. (*Id*.) Bregenzer did not want to do anything that would decrease KAC's revenue and its value to BHG. (*Id*. at 110-11.) Berry testified that Bregenzer watched the revenue numbers very closely, and when there was a dip in the numbers, he instructed staff to keep patients longer and bill for other services. (R. 252 Tr. 56-57.) He monitored KAC's revenue every day. (R. 252 Tr. 59.)

Thus, the evidence established that Bregenzer controlled the amount of revenue into KAC and that he did so with the goal of personally profiting from its sale. This is sufficient evidence that the company's revenues were effectively under his control. He purposely took measures to increase those revenues so that he would personally receive multiples of the annual revenues when the company sold. Thus, Bregenzer should forfeit at least the $325,152.44 in proceeds that the government seeks.

For all these reasons, the Court hereby ORDERS that the government's motion (R. 326) for a preliminary judgment of forfeiture in the form of a money judgment against Defendant Michael Bregenzer in the amount of $325,152.44 is GRANTED.

\* \* \* \* \* \* \*

This 22nd day of July, 2026.



Signed By:

*Karen K. Caldwell*

**United States District Judge**